```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2
                        CASE NO. 24-MJ-03998-AOV-1
 3
       UNITED STATES OF AMERICA,
 4                                        Miami, Florida
                   Plaintiff(s),
 5                                        September 20, 2024
              vs.
 6
       MALONE LAM,
 7
                   Defendant(s).      Pages 1 - 28
 8     -----------------------------------------------------------

 9                         DETENTION HEARING
                 TRANSCRIBED FROM DIGITAL AUDIO RECORDING
10                BEFORE THE HONORABLE ALICIA O. VALLE
                    UNITED STATES MAGISTRATE JUDGE
11
       APPEARANCES:
12
       FOR THE PLAINTIFF(S):   JONATHAN STRATTON, ESQ.
13                             UNITED STATES ATTORNEY'S OFFICE
                               99 NE 4th Street
14                             Miami, FL 33132
                               305-961-9416
15                             jonathan.stratton@usdoj.gov

16

17     FOR THE DEFENDANT(S):   DIEGO WEINER, ESQ.
                               JEFFREY S. WEINER, P.A.
18                             9130 S. Dadeland Boulevard
                               Miami, FL 33156
19                             305-670-9919
                               lawfirm@jeffweiner.com
20

21

22     TRANSCRIBED BY:         Joanne Mancari, RPR, CRR, CSR
                               Court Reporter
23                             jemancari@gmail.com

24

25
```

```
 1    Thereupon,
 2    the following proceedings were held:
 3              THE DEPUTY CLERK:  Page 12, Malone Lam, 24 MJ 3998.
 4              Government counsel, announce your appearance.
 5              MR. STRATTON:  Good afternoon, your Honor.  Jonathan
 6    Stratton on behalf of the United States.
 7              THE COURT:  I'm sorry.  Stratton?
 8              MR. STRATTON:  Stratton, yes.  S-T-R-A-T-T-O-N.
 9              THE COURT:  Thank you, Mr. Stratton.
10              MR. WEINER:  And good afternoon, your Honor.  Diego
11    Weiner, from the Law Offices of Jeff Weiner, on behalf of
12    Mr. Malone Lam.
13              THE COURT:  Diego.  Are you Jeff's son?
14              MR. WEINER:  I am Jeff's son, your Honor.
15              THE COURT:  How cool.  I've never met you before.  Let
16    me put my glasses on.
17              MR. WEINER:  Pleasure to meet you in the flesh, your
18    Honor.
19              THE COURT:  Very nice.  I didn't know Jeff had a son.
20    This was great.
21              MR. WEINER:  Your Honor, if I may make a quick
22    request.  May I have just one brief moment to speak to my
23    client before we begin the proceeding?
24              THE COURT:  Yes, you may.
25              MR. WEINER:  Very briefly.  Excuse me.
```

```
 1              THE COURT:  Yes.
 2              (Pause)
 3              MR. WEINER:  We're ready to proceed, your Honor.
 4    Thank you very much.
 5              THE COURT:  All right.  Thank you.
 6              All right.  So, Mr. Stratton, we are here scheduled
 7    for a pretrial detention hearing and removal hearing.  Are we
 8    going forward or have the parties reached an agreement?
 9              MR. STRATTON:  We are going forward, your Honor.
10              THE COURT:  All right.  Thank you.
11              Mr. Weiner, I am going to turn to you for just a
12    moment.  Are we going to be doing both pretrial detention and
13    the removal hearing, identity hearing?  Where are we on that?
14              MR. WEINER:  Your Honor, we will be moving forward on
15    a pretrial detention hearing and we will likely be waiving the
16    removal hearing --
17              THE COURT:  OK.  Gotcha.
18              MR. WEINER:  -- thereafter.
19              THE COURT:  And identity as well.
20              MR. WEINER:  Yes, your Honor.
21              THE COURT:  All right.  I just wanted to get an idea
22    of where we were going.
23              MR. WEINER:  Thank you very much.
24              THE COURT:  All right.  Mr. Stratton, I'll hear from
25    you.  This is a removal case.  It's an indicted case, so
```

```
 1    probable cause exists in terms of the indictment.  We don't
 2    have to have that hearing at least.  So we'll hear what you
 3    have to say.
 4                MR. STRATTON:  Your Honor, the government's moving
 5    based on risk of flight and danger to the community.  The
 6    defendant faces stat --
 7                THE COURT:  Hold on.  I'm sorry.  Give me a minute.
 8                MR. STRATTON:  No problem.
 9                (Pause)
10                THE COURT:  OK.  So you're doing risk of flight and
11    danger, right?
12                MR. STRATTON:  Correct.  The defendant faces a
13    two-count indictment.  Each count carries a 20-year statutory
14    maximum.  The government's initial calculation of the guideline
15    range puts it at 168 to 210 months.  That is driven by a loss
16    amount here of approximately $230 million.
17                Your Honor, the government is prepared to proceed by
18    proffer.  We do have FBI special agent Justin Gallenstein
19    available to testify for cross-examination.
20                THE COURT:  What is Justin's last name?
21                MR. STRATTON:  Gallenstein.  G-A-L-L-E-N-S-T-E-I-N.
22    Nailed that.
23                THE COURT:  All right.  Thank you very much.
24                I will hear your proffer.
25                MR. STRATTON:  All right.  Your Honor, on August 18
```

and 19, 2024, the defendant and his coconspirators stole over $230 million in cryptocurrency from a victim in Washington, D.C.  They targeted the victim because they identified him as a high-net-worth crypto investor from the early days of cryptocurrency.

The defendant and his coconspirators called the victim and impersonated Google support Team members.  They told the victim that there was a hack attempt on his Google account and they needed to shut it down.

After a long period of questioning they convinced the victim to provide security codes to his Google account.  The defendant then accessed the victim's gmail account and his One Drive account to locate his crypto assets.

The defendant also scoured the private accounts looking for seed phrases and account information.

In doing so the defendant located a Gemini cryptocurrency exchange records in the victim's Google accounts, and the conspirators agreed that one of them would call the victim back and pose as a Gemini crypto exchange security Team member.  In doing so they convinced the victim that his crypto accounts had been compromised.

Initially they convinced the victim to transfer a small portion, approximately $3 million, of his cryptocurrency --

THE COURT:  I'm sorry.  How much?

1    MR. STRATTON:  The initial transfer was 3 million to a

2 crypto wallet controlled by the defendant.

3    The group then convinced the victim to download a

4 remote desktop connection program for his own security and this

5 allowed the defendant to log into the victim's computer and

6 steal over 4,000 Bitcoin.

7    In total, the defendant and his coconspirators stole

8 well over $230 million in cryptocurrency from the victim.

9    The defendant and his coconspirators were in realtime

10 communications during this event over Discord and Telegram.

11    The government is in possession of the screen

12 recording capturing the defendant using the $$$ Telegram handle

13 and the Anne Hathaway Discord display name to discuss

14 strategies to manipulate the victim in allowing them access to

15 his crypto holdings.

16    The government is in possession of numerous documents

17 and photos attributing the $$$, as alleged in the indictment,

18 as an a/k/a Telegram handle to the defendant.  For example, the

19 defendant sent photos of himself to friends using the $$$

20 Telegram handle.  He sent photos of his brand new white sports

21 car with his name painted on the side of it to his friends

22 using the $$$ Telegram handle.

23    In a recorded post-Miranda interview the defendant

24 admitted to using the $$$ Telegram handle, admitted to

25 committing the crypto theft with his coconspirators, and

1  admitted to dividing up the stolen funds and laundering it

2  through various cryptocurrency exchanges.

3       THE COURT:  I'm sorry.  So admitted to the theft and

4  what else?

5       MR. STRATTON:  He admitted to using the Telegram

6  handle, the $$$, admitted to the theft, and admitted to

7  dividing up the stolen funds amongst his coconspirators, and to

8  laundering it through various cryptocurrency exchanges.

9       Following the laundering of these funds, the defendant

10  went on what only can be described as an outrageous and

11  exorbitant spending spree.

12       Over the course of a few weeks the defendant became

13  notorious in the Los Angeles nightclub scene.  Government

14  surveillance captured the defendant at a Los Angeles nightclub

15  spending hundreds of thousands of dollars a night and tossing

16  out handbags valued at tens of thousands of dollars.

17       Management at the nightclub informed the government

18  the defendant attempted to pay in cryptocurrency and was

19  spending upwards of half a million dollars a night at the club.

20  For example, the government is in possession of one receipt

21  from --

22       THE COURT:  You have to slow down.  This is just a

23  lot.

24       MR. STRATTON:  I understand, your Honor.

25       THE COURT:  OK.  So Los Angeles nightclubs, thousands

1    of dollars a night, throwing expensive handbags out to folks.

2          MR. STRATTON:  The government is in possession of a

3    receipt from one Los Angeles nightclub where the defendant

4    spent $569,525 in a single night.  I can itemize that for your

5    Honor, but I will just tell you that that is the total amount.

6          The defendant also spent the victim funds on the

7    collection of luxury automobiles, some valued as high as $3

8    million.

9          Agents recovered bills of sale at his Miami residence

10   for his automobiles.

11         In the post-Miranda interview, he admitted to

12   purchasing 31 automobiles.  Many have yet to be located, like

13   the automobile that he sent to his friends that had his name

14   painted on the side.

15         On September 10, 2024, the defendant and his friends

16   flew on a private jet from Los Angeles to Miami to continue

17   spending the victim's money.

18         The defendant rented multiple homes in Miami,

19   including a residence on Hibiscus Island, along with two other

20   luxurious homes near the water.

21         The Pretrial Services report states that the defendant

22   indicated he was renting one of those three homes for $68,000 a

23   month, from which the defendant continued spending the victim's

24   funds in Miami on nightclubs, jewelry, and cars, and he was

25   arrested on September 18, 2024.

```
 1              THE COURT:  I'm sorry.  What date?  September?

 2              MR. STRATTON:  September 18th.

 3              From two of his residence in Miami, the agents seized

 4    nine luxury automobiles, including luxury watches and including

 5    a watch that was purchased for $1.8 million.

 6              THE COURT:  I'm sorry.  Did you say nine luxury?

 7              MR. STRATTON:  Luxury automobiles of the 31 the

 8    defendant stated he purchased, and they also recovered a luxury

 9    watch, which was purchased for $1.8 million.

10              Also in the post-Miranda interview, the defendant

11    admitted to doing additional hacks and making millions of

12    dollars from those additional crypto fraud schemes, which the

13    defendant further stated supported his entire lifestyle since

14    he arrived in the United States in October of 2023.

15              The defendant has no ties to the United States, as he

16    is a Singaporean citizen, who was here via the Visa Waiver

17    Program, which provides --

18              THE COURT:  I'm sorry for the interruption.  Arrived

19    in when of 2023?

20              MR. STRATTON:  October, and the defendant's here

21    pursuant to the Visa Waiver Program, which provides a 90-day

22    stay.

23              THE COURT:  So he is an overstay?

24              MR. STRATTON:  He is an overstay.  We believe his stay

25    expired in January of 2024.
```

1          The defendant also has no permanent residence here in

2     the United States and has not been lawfully employed.

3          Finally, your Honor, as to the defendant's

4     codefendant, he was arrested in Los Angeles.  He has stipulated

5     to detention in his case.

6          I wanted to point out to your Honor that his

7     codefendant's girlfriend tipped off the defendant before your

8     Honor prior to his arrest and the defendant here immediately

9     deleted his Telegram account, evidencing the defendant's desire

10    to obstruct justice as that Telegram account would have

11    significant evidence regarding the charged crimes.

12         That completes the government's factual proffer.

13         THE COURT:  Very unusual proffer, I have to admit.

14         MR. STRATTON:  It took me a while to put it together.

15    It is not obviously my case, your Honor.  I am covering for my

16    colleagues in the District of Columbia, but we've been working

17    on this all week, and here we are.

18         THE COURT:  All right.  Thank you.

19         Mr. Weiner.

20         MR. WEINER:  Yes, your Honor.  We'd like to

21    cross-examine the agent.

22         THE COURT:  Thank you.

23         MR. STRATTON:  The United States now calls FBI special

24    agent Justin Gallenstein to the stand.

25         THE MARSHAL:  Please remain standing to be sworn in.

Gallenstein – Cross

1          THE DEPUTY CLERK:  Please raise your right hand to be

2    sworn.

3          Do you swear or affirm the testimony you are about to

4    give in this cause to be the truth?

5          THE WITNESS:  I do.

6          THE DEPUTY CLERK:  Please speak into the microphone

7    and state your full name and title and spell your last name.

8          THE WITNESS:  My title is special agent.  My first

9    name is Justin, J-U-S-T-I-N.  Last name Gallenstein,

10   G-A-L-L-E-N-S-T-E-I-N.

11         THE COURT:  Thank you, agent Gallenstein.  Thanks for

12   being here.

13         Mr. Weiner, you may proceed with your

14   cross-examination.

15         MR. WEINER:  Thank you, your Honor.

16    JUSTIN GALLENSTEIN,

17        called as a witness,

18        having been duly sworn, testified as follows:

19   CROSS-EXAMINATION

20   BY MR. WEINER:

21   Q   Good afternoon, special agent.

22   A   Good afternoon.

23   Q   Special agent, how did this investigation begin?

24   A   It began with a tip from the victim.

25   Q   OK.  Have you met with the victim in this case?

Gallenstein – Cross

 1   A   I have not.

 2   Q   OK.  You've never had a conversation with him?

 3   A   I have not.

 4   Q   Have you reviewed any of the records or purported evidence

 5   that this alleged victim has?

 6   A   Yes.  I've seen screenshots.

 7   Q   OK.  But did you do so here in the Southern District of

 8   Florida or in D.C.?

 9   A   Here.

10          THE COURT:  I'm sorry.  Agent, are you from here or

11   from D.C.?

12          THE WITNESS:  From here, your Honor.

13          THE COURT:  OK.

14   BY MR. WEINER:

15   Q   So you have not had an opportunity to review any of the

16   evidence, let's say, prior to a charging decision?

17   A   No.

18   Q   You didn't review any financial documents?

19   A   No.

20   Q   Bank accounts?

21   A   No.

22   Q   Cryptocurrency exchange records?

23   A   No.

24   Q   OK.  Were you involved in issuing subpoenas in this case,

25   sir?

Gallenstein - Cross

```
 1   A    No.
 2   Q    Were you involved at any stage of the investigation in this
 3   case?
 4   A    No.
 5   Q    OK.  So it's fair to say that whatever knowledge you do
 6   have is based on the investigation conducted by additional FBI
 7   agents, correct?
 8   A    And my review of that evidence, yes.
 9   Q    But you reviewed documents?
10   A    Yes.
11   Q    The indictment?
12   A    Yes.
13   Q    But you haven't actually spoken to any witnesses involved
14   in this case?
15   A    Correct.
16   Q    Did you have any involvement in the arrest?
17   A    No.
18   Q    OK.  You didn't serve the arrest warrant?
19   A    No.
20   Q    So it's all secondhand information that you've received
21   from additional FBI agents?
22   A    Yes.
23   Q    Do you have any knowledge about the grand jury proceedings
24   in this case?
25   A    Can you clarify?
```

1    Q   Yes, sir.

2           Do you know when the grand jury proceeding was in this

3    case?

4    A   No, not precisely.

5    Q   Or what witnesses testified in the grand jury?

6    A   No.

7    Q   OK.  You didn't testify before the grand jury?

8    A   I did not.

9    Q   Could you give me an example of some of the documents that

10   you reviewed prior to you taking the stand today?

11   A   The affidavits for the search warrants, the overall

12   investigation.  I am a cyber agent as well.  In the course of

13   my duties I investigate crimes similar to this.  So I've had

14   multiple conversations with the case agent regarding this case

15   and all aspects of it.

16   Q   OK.  But you didn't investigate this case, to be clear?

17   A   I did not.

18   Q   OK.  But please give me specific references of documents

19   that you reviewed in this case.  So, for example, you mentioned

20   affidavits.  Did you review any exchange records in this case?

21   A   I did not.

22   Q   OK.  Any -- let's see.  Were you present during the

23   purported confession that my client gave in custody?

24   A   I was not.

25   Q   Are you aware whether -- it was mentioned that it was

1    post-Miranda statements, but you were not present in the room?

2    A    I was not present.

3    Q    Have you viewed a recording of the confession?

4    A    I have not.

5    Q    OK.

6          MR. WEINER:  Your Honor, I have no further questions.

7          It is not a meaningful opportunity to cross-examine an

8    agent that knows nothing about the case.  No disrespect, sir,

9    as you didn't take part in the investigation.

10         That's all for the defense, your Honor.

11         THE COURT:  Thank you.

12         Anything further from you, Mr. Stratton?

13         MR. STRATTON:  No, your Honor.

14         THE COURT:  Thank you, agent.  You may step down.

15         THE WITNESS:  Thank you.

16         (Witness excused)

17         THE COURT:  Mr. Stratton, anything further?

18         MR. STRATTON:  Nothing evidence factual-wise.

19         THE COURT:  Thank you.

20         Mr. Weiner, anything in terms of evidence?

21         MR. WEINER:  No evidence from the defense, your Honor.

22         THE COURT:  All right.  Thank you.

23         Mr. Stratton, I'll hear your argument.

24         MR. STRATTON:  Your Honor, as to risk of flight, the

25    defendant has no status here in the United States.  He's a visa

1    overstay.  He has no family members here in the United States,

2    according to the Pretrial Services report.  He has been in

3    Miami, according to the Pretrial Services report, for seven

4    days.  Importantly, he has no ties -- I don't think the

5    defendant has actually ever been to the Washington, D.C., area

6    where the charges are brought.

7         Obviously as a result of this scheme the defendant has

8    significant assets that provide the ability to flee

9    prosecution.

10        We have consulted with the Office of International

11   Affairs, OIA, at DOJ.  There is an extradition treaty with

12   Singapore; however, it is unclear at this time whether they

13   will extradite their own nationals.  So that is the best I

14   could do in the short time frame.

15        The defendant is also facing a significant sentence,

16   your Honor.  At the low end of the guideline range it is 168

17   months.  So well over ten years of incarceration for the

18   defendant.

19        So for those reasons he presents a substantial risk of

20   flight, that Pretrial Services agrees.

21        As to danger, the defendant presents two dangers.  One

22   is, he is obviously a sophisticated cryptocurrency fraudster.

23   He executed one of the most significant cryptocurrency hacks in

24   the country.  He can do those kinds of hacking from anywhere,

25   and there is no reasonable combination of conditions that

1    Pretrial Services can implement that will prevent his ability

2    to further exploit crypto investors throughout the country.

3         The second part of the danger argument, your Honor, is

4    the defendant's inclination to obstruct justice.  The defendant

5    was tipped off by his codefendant's girlfriend and immediately

6    engaged in further criminal activity by deleting his Telegram

7    account and obstructing justice in this investigation.

8         Again, there is no combination of conditions that

9    Pretrial Services can implement that will prevent the defendant

10   from further obstructing justice.  As you can imagine, your

11   Honor, a lot of this evidence exists electronically.  The

12   defendant's ability to hide that electronic evidence is

13   significant.

14        There is also an additional 22 automobiles that remain

15   left unaccounted for.  This not only provides the defendant

16   with significant assets for potential flight but it also

17   provides further ability to obstruct justice to hide the fruits

18   of his crime.

19        So for those reasons the government seeks pretrial

20   detention based on risk of flight and danger to the community.

21        THE COURT:  Thank you very much.

22        Mr. Weiner, I'll hear you.

23        MR. WEINER:  Yes, your Honor.  Thank you so much.

24        Your Honor, it's our position that the government has

25   not established the four elements or, excuse me, the four

1    considerations that this court must look at regarding pretrial

2    detention and that there's no reasonable set of circumstances

3    which can assure both the appearance of the defendant at future

4    court proceedings and the safety of the community.

5         Your Honor, I just want to tell you a little bit about

6    the defendant's history.  He's 20 years old.  He has asthma.

7    He has zero criminal history.  This crime, while very serious,

8    is not a crime of violence.  There is no indication that he has

9    ever missed a court date or a court proceeding.  Your Honor,

10   while --

11        THE COURT:  He just started.  OK.

12        MR. WEINER:  But he is present before the court today,

13   your Honor.

14        THE COURT:  Not willingly.

15        MR. WEINER:  I understand, your Honor.

16        THE COURT:  But let's go on.  I get it.  You're doing

17   what you got.

18        MR. WEINER:  So, your Honor, I appreciate the

19   government having the agent at our disposal; however, not

20   having an opportunity to cross-examine the agent in charge or,

21   at the very least, an agent that has some firsthand knowledge

22   of the case in our opinion really does not allow for a

23   meaningful cross-examination in this case.

24        Now, we heard a proffer from the government, your

25   Honor, and we heard about a confession, but, your Honor, in a

1    case like this we're addressing whether he is going to be a

2    flight risk.  Now I want your Honor to know, as it's indicated

3    in the Pretrial Services report, that he does have a passport,

4    a Singapore passport, which is in the possession of the

5    government.

6         Your Honor, as far as the evidence when we're talking

7    about in this case, I believe -- right now he is in the middle

8    of -- he was moving to Miami, your Honor.  So the fact that he

9    doesn't have an established residence is more to do with the

10   fact that he was moving from California to Miami.  He was

11   renting a home here, and he can continue that month-to-month

12   rent in another Airbnb or in another long-term rental property.

13        Now, your Honor, with regard to what we would be

14   asking of the court and the conditions that we feel will

15   actually ensure that he shows up to court and is here for any

16   future proceedings, we are asking that the court grant him a

17   $250,000 corporate surety bond with electronic monitoring and,

18   of course, he is going to waive removal.  He will sign a waiver

19   of extradition.  Of course, there will be a Nebbia requirement

20   in the bond, your Honor.

21        I just want the court to be cognizant of the fact that

22   he does have no priors, and while the crime is very serious, I

23   believe that that along with some special conditions in his

24   pretrial release, as far as what he can do employment worthy,

25   where he can go, where he can travel, those will assure that he

```
1    is present at all future court proceedings, your Honor, and
2    he's not indicated that, meaning his previous conduct has never
3    indicated that he won't be present at a court proceeding.
4              If I have one more moment, your Honor.
5              THE COURT:  Sure.
6              (Pause)
7              MR. WEINER:  So, your Honor, for those reasons we ask
8    that this court grant him the bond we have requested herein.
9              THE COURT:  You suggested a 250 corporate surety bond
10   with a Nebbia?
11             MR. WEINER:  Yes, your Honor, plus electronic
12   monitoring -- the government already has his passport -- a
13   waiver of extradition, a waiver of removal.
14             THE COURT:  Extradition, are you talking waiver of
15   extradition to Singapore?
16             MR. WEINER:  From any international extradition or
17   from states, your Honor, or from other federal districts.
18             THE COURT:  OK.  Well, that is a new one.  Thank you.
19             I'm in the middle of an extradition hearing myself in
20   Fort Lauderdale.  I wish they'd waive extradition.
21             All right.  Thanks so much.
22             In this case he may, in fact, have the funds to make
23   that 250,000 corporate surety bond, right?
24             MR. WEINER:  He may, your Honor, and of course --
25             THE COURT:  There is a Nebbia condition.
```

1          MR. WEINER:  -- it will be pursuant to a Nebbia.

2          THE COURT:  Right.

3          MR. WEINER:  Yes, your Honor.

4          THE COURT:  Right.  Right.  Thank you.

5          I'm prepared to rule.

6          You would not consider a stipulation to detention,

7    correct?

8          MR. WEINER:  No, your Honor.

9          THE COURT:  OK.  All right.

10         In this case the matter comes before the court on the

11   government's motion that the defendant, Malone Lam, be detained

12   pending trial of this matter.  In considering the government's

13   request, as I said before, I am guided by several principles.

14         First, at all times the defendant is entitled to the

15   presumption of innocence.  Nothing that takes place during this

16   hearing or that I set forth in my findings is intended or

17   should be construed to affect that presumption.  Rather, the

18   purpose of this hearing is merely to determine whether or not,

19   withstanding the presumption of innocence, the defendant should

20   be detained pending trial.

21         Second, under the Bail Reform Act pretrial detention

22   is considered an exceptional step.  Under the Act, a defendant

23   must be released prior to trial unless I find that no condition

24   or combination of conditions exists that will reasonably assure

25   the appearance of the defendant if the government seeks

1   detention based on him being a risk of flight or reasonably

2   assure the safety of any other person in the community when the

3   government seeks detention based on the defendant being a

4   danger to others in the community.

5          The Act requires me to impose the least-restrictive

6   conditions that are necessary to provide those reasonable

7   assurances.  If I cannot find any such conditions, then I am

8   required by the Act to order that the defendant be detained

9   pending trial.

10         Again, as I said in the beginning, the government

11  seeks detention in this case based on both prongs -- danger and

12  risk of flight.

13         As to risk of flight, the government must show by a

14  preponderance of the evidence that no condition or combination

15  of conditions will reasonably assure the defendant's presence

16  as required.

17         As to danger, the government has a slightly higher

18  burden.  The government has to establish by clear and

19  convincing evidence that no condition or combination of

20  conditions will reasonably assure the safety of the community.

21         This is not a presumption case, so my analysis next

22  turns to the four specific factors that the Act requires me to

23  consider in making this decision.

24         The first is the nature and circumstances of the

25  alleged offense.  The second is the weight of the evidence

1   against the defendant.  The third is the history and

2   characteristics of the defendant.  This includes the

3   defendant's physical and mental condition, family ties,

4   employment, length of residence in the community, community

5   ties, past conduct, criminal record, history of drug or alcohol

6   abuse, record of appearance at prior court proceedings, and

7   whether the defendant was on conditional release of some sort

8   at the time of the new alleged offense.  Lastly, I consider the

9   nature and seriousness of the danger to others in the

10  community.

11          I have considered all of these factors, and I have

12  given consideration to the agent's testimony, the government's

13  proffer, and the arguments of both counsel.  I have also given

14  consideration to the recommendation in the Pretrial Services

15  report, and in this case the Pretrial Services officer

16  recommends that the defendant be detained pending trial.

17          I agree with that recommendation for the following

18  reasons:  I find that the government has certainly met its

19  burden that the defendant is a risk of flight by more than a

20  preponderance of the evidence.  According to -- give me a

21  minute to get back to my notes.

22          Mr. Lam is charged in a two-count indictment along

23  with a codefendant.  The codefendant was separately arrested in

24  LA, I believe, and is probably making his way back to

25  Washington as well.  But the two counts charge Mr. Lam and his

1    codefendant with wire fraud, conspiracy to commit wire fraud,

2    and conspiracy to launder money.  Each of those counts carries

3    a maximum penalty of up to 20 years.  So consecutively you're

4    looking at a 40-year maximum sentence.

5           The advisory guideline range has been calculated to be

6    at 168 to 210 months.  That is more than ten years, which seems

7    like a lifetime to somebody of Mr. Lam's age.  The reason for

8    such a high guideline range, of course, is the amount of loss,

9    which is more than $230 million to the victim.

10          According to the government's proffer, the defendant

11   and codefendant engaged in some kind of elaborate phishing

12   scam, where they were able to convince the individual, the

13   victim, to give them his personal financial information,

14   ultimately resulting -- and by impersonating Google support

15   personnel and Team members got the victim to provide them his

16   security password to various gmail and Google accounts and

17   thereby ultimately stealing more than $230 million from the

18   victim.  Thereafter, they laundered these funds allegedly using

19   multiple cryptocurrency addresses, exchanges, and mixers, in an

20   attempt to conceal the ownership of the money and, of course,

21   disguise its origin.

22          As the government proffered, the defendant then went

23   on -- as I was listening to the evidence, I could only think of

24   Ferris Bueller gone bad -- spent this money wildly, going to

25   Los Angeles nightclubs, purchasing more than 30 high-end luxury

1   automobiles.  I mean, an incredible amount of spending and

2   craziness that followed his coming into more than $230 million.

3          Most troubling to the court, of course, is the fact

4   that the codefendant's girlfriend has told law enforcement that

5   she tipped off the defendant that this arrest and indictment

6   was coming and the defendant deleted his Telegram account in an

7   effort to avoid detection and thereby obstruct justice.  The

8   court does not take obstruction of justice lightly.

9          He has no ties to the southern Florida community.  He

10  has no ties to the D.C. community.  According to the Pretrial

11  Services report, he seems to have very little ties anywhere

12  except Singapore.  He's lived in Texas, LA, Canada.  Just a bit

13  of a rolling stone.  No ties to South Florida.  No other job

14  except his self-admitted job as a crypto investor for the last

15  eight months, and we know what he was doing investing other

16  people's money, according to the indictment.

17         The government's investigation is thorough.  They were

18  able to confirm that the $$$ sign moniker that the defendant

19  was using on the Telegram account by checking some of the

20  content of those communications, which included the defendant's

21  photographs of himself, he included photographs of a brand new

22  sports car that he sent to his friends, but, more importantly,

23  post-Miranda the defendant pretty much admitted everything he

24  did.  He admitted to using the moniker.  He admitted to the

25  theft.  He admitted to splitting the proceeds of the theft with

1    his coconspirators, and he admitted to laundering those

2    proceeds.

3         He is also here on a visa, which expired long ago.

4         For all of those reasons I find that the government

5    has overwhelmingly established that the defendant poses a risk

6    of flight.

7         He also has significant assets, including -- I think

8    only nine cars were discovered.  Obviously, that leaves 20 -- I

9    forget how many cars there were, but it leaves a lot of cars

10   that are out there that could certainly be sold to get money

11   with which to flee.  There is also no evidence as to whether or

12   not Singapore would extradite one of its own nationals on this

13   type of offense.

14        In terms of danger, I disagree with the government's

15   argument that he is dangerous because there is no condition

16   that I could impose that would prevent him from continuing to

17   engage in this kind of electronic crime.  I'm analogizing this

18   to a child pornography type case where it is a very dangerous

19   case, but there are conditions that I can impose, as long as I

20   restrict that individual's use of electronic means, all

21   internet access, all of that.  The problem here, of course, is

22   that I don't have a third-party custodian that can make that

23   happen.  But that is not why I find the defendant to be a

24   danger.  I found the defendant to be a danger because of his

25   proclivity to obstruct, as I mentioned before.  So in that

1    regard I find him to be both a risk of flight and a danger.

2           That is my ruling today.

3           I ask the government in all of these cases to draft a

4    pretrial detention order that includes my findings of fact and

5    conclusions of law.

6           Please give my law clerk, give her your email so she

7    will email you one of my previous orders so you can please

8    follow that format in order to make my life a little easier,

9    and to do so by close of business Monday morning.  I'm sorry.

10   Monday, Monday morning.

11          MR. STRATTON:  Will do, your Honor.

12          THE COURT:  All right.  Thank you.

13          Mr. Weiner, thank you for being here.  It was a

14   pleasure to meet you.  I want to wish Mr. Lam luck.  But before

15   we do that we need to know what you are doing with removal.

16          MR. WEINER:  He's waiving removal, your Honor.

17          THE COURT:  All right.  That includes waiving

18   identity?

19          MR. WEINER:  Yes, your Honor.

20          THE COURT:  Thank you.  I appreciate that.

21          Mr. Lam, so you understand, that means that you're not

22   entitled to have another detention hearing in D.C.  This is it.

23          You understand that, right?

24          THE DEFENDANT:  Yes, your Honor.

25          THE COURT:  All right.  Thanks.  Good luck to you,

```
 1   sir.

 2             THE DEFENDANT:  Thank you, your Honor.

 3             MR. WEINER:  Thank you very much, your Honor.

 4   Pleasure.

 5             THE COURT:  Thank you.  Pleasure.  Say hello to your

 6   father.

 7             (Adjourned)

 8

 9                      C E R T I F I C A T E

10

11        I hereby certify that the foregoing is an accurate

12   transcription to the best of my ability of the digital audio

13   recording in the above-entitled matter.

14

15   November 3, 2024         s/ Joanne Mancari
                               Joanne Mancari, RPR, CRR, CSR
16                             Court Reporter
                               jemancari@gmail.com
17

18

19

20

21

22

23

24

25
```